UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEODRON, LTD., | Case No. 19-cv-05644-SI |
| Plaintiff, | |
| v. | **ORDER RE CLAIM CONTRUCTION AND MOTIONS TO STRIKE** |
| LENOVO GROUP, LTD., et al., | Re: Dkt. Nos. 72, 80, 81, 82 |
| Defendants. | |

On July 1, 2020, the Court heard argument on the parties' proposed claim constructions. Having considered the arguments of the parties and the papers submitted, the Court construes the disputed terms as follows.  Additionally, pursuant to Civil Local Rule 7-1(b) the Court hereby vacates the July 24, 2020, hearing on defendants' motion to strike; the motion is GRANTED.

## ISSUE ONE: CLAIM CONSTRUCTION

### BACKGROUND

On September 06, 2019, plaintiff Neodron LTD. ("Neodron") filed this action pertaining to seven asserted patents: United States Patent Nos. 8,451,237 ("the '237 patent"); 8,102,286 ("the '286 patent"); 7,821,502 ("the '502 patent"); 8,502,547 ("the '547 patent"); 8,946,574 ("the '574 patent"); 9,086,770 ("the '770 patent"); and 10,088,960 ("the '960 patent").   Dkt. No. 1 ¶ 1 (Complaint).  Neodron is the sole owner of the asserted patents. *Id.* at ¶ 6.  The patents generally relate to touchscreen technology. *Id.* at ¶ 1.

According to the complaint, defendants Lenovo Group Ltd., Lenovo Inc., and Motorola Mobility LLC ("defendants") "make, use, offer for sale, sell, and/or import certain products . . . that directly infringe" Neodron's patent rights. Dkt. No. 1 at ¶¶ 7-9 (Complaint).  Specifically, Neodron

United States District Court
Northern District of California

United States District Court
Northern District of California

1    alleges defendants' products, such as the Lenovo Yoga 730 and Motorola Moto G6, infringe the

2    '286 Patent and the '547 Patent. *Id.* at ¶¶ 17 (Count 1 '286 patent), 33 (Count 3 '547 patent).

3    Additionally, Neodron alleges defendants' products, such as the Lenovo Thinkpad X1 Yoga,

4    infringe the '237 Patent, the '574 Patent, the '770 Patent, and the '960 Patent. *Id.* at ¶¶ 15 (Count 2

5    '237 patent), 41 (Count 4 '574 patent), 49 (Count 5 '770 patent), 57 (Count 6 '960 patent)[1].

6    Defendants deny infringement and claim the patents are invalid. Dkt. Nos. 16 (Lenovo's Answer),

7    17 (Motorola's Answer).

8

9                                  **LEGAL STANDARD**

10          Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372

11   (1996). Terms contained in claims are "generally given their ordinary and customary meaning."

12   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary

13   meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the

14   art in question at the time of the invention[.]" *Id.* at 1313. In determining a claim's proper

15   construction, a court begins with intrinsic evidence, consisting of the claim language, the patent

16   specification, and, if in evidence, the prosecution history. *Id.* at 1314; *see also Vitronics Corp. v.*

17   *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The appropriate starting point . . . is

18   always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris*

19   *Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019,

20   1023 (Fed. Cir. 1997).

21          Accordingly, although claims speak to those skilled in the art, claim terms are construed in

22   light of their ordinary and accustomed meaning, unless examination of the specification, prosecution

23   history, and other claims indicates the inventor intended otherwise. *See Electro Medical Systems,*

24   *S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994). The written description can

25   provide guidance as to the claims' meaning, thereby dictating how to construe claims, even if the

26

27          [1] The Court notes that the complaint and the parties' claim construction briefing all address

28   the patents in different order. For ease of reference, the Court addresses the patents with disputed
     terms first, in numerical order, then addresses the patents argued to be indefinite.

guidance is not provided in explicit definitional format. *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). In other words, the specification may define claim terms "by implication" such that the meaning may be "found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1582, 1584 n.6.

In addition, the claims must be read in view of the specification. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). This "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. *See Comark*, 156 F.3d at 1187. However, it is a fundamental rule that "claims must be construed so as to be consistent with the specification[.]" *Phillips*, 415 F.3d at 1316 (citations omitted). Therefore, if the specification reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistently with that limitation. *Id.*

Finally, the Court may consider the prosecution history of the patent, if in evidence. *Markman*, 52 F.3d at 980. The prosecution history limits the interpretation of claim terms to exclude any interpretation that was disclaimed during prosecution. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.* at 1309. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (citation omitted). All extrinsic evidence should be evaluated in light of the intrinsic evidence. *Id.* at 1319.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

### DISCUSSION

Pursuant to Patent Local Rule 4-3(a), parties are required to identify up to ten terms whose construction will be most significant to the resolution of the case.  The parties have identified four terms for construction in their joint claim construction statement.  Dkt. No. 96 at 4 (Joint Claim Construction).  The Court addresses each of the disputed terms in turn.

**I.      '286 Patent - "sensor value"**

The '286 patent, entitled "Capacitive Keyboard with Non-Locking Reduced Keying Ambiguity," discloses a method and apparatus for preventing accidental false inputs from keys adjacent to a selected key in a capacitive keyboard.  Dkt. No. 72-2, *Exhibit A* ('286 patent); Dkt. No. 73 at 13[2] (Pltf's Opening Brief).  These arrays of capacitive proximity sensors are often used in keyboards, keypads, and other touch-input apparatus.  Dkt. No. 72-2, *Exhibit A* ('286 patent); Dkt. No. 73 at 13 (Pltf's Opening Brief).  The term "sensor value" appears in independent claims 1, 9, 10, and 21 of the '286 patent.  Dkt. No. 72-2, *Exhibit A* ('286 patent).  Claim 1, which is representative of the other claims, reads:

> 1. A key panel comprising:
>
>> a plurality of keys; and
>>
>> control logic operatively coupled to the plurality of keys, the control logic being configured to detect a **sensor value** of an inactive key surpassing a **sensor value** of an active key by a select amount and assigning the inactive key as the active key, wherein the key assignment is biased in favor of the currently active key by increasing **sensor values** of the currently active key.

Dkt. No. 72-2, *Exhibit A* at 8:55-65 (emphasis added) ('286 patent).

| Plaintiff Neodron | Defendants |
|---|---|
| Plain and ordinary meaning of "measurable sensor signal value"<br><br>Dkt. No. 96 at 4 (Joint Claim Construction). | Plain and ordinary meaning of "value indicating the strength of the sensor signal"<br><br>Dkt. No. 96 at 4 (Joint Claim Construction). |

---

[2] For ease of reference, all citations to page numbers refer to the ECF branded number in the upper right corner of documents.

4

**The Court construes "sensor value" as "measurable sensor signal value" for three reasons.**

First, "[t]he patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012). Defendants argue language limiting the term is necessary because the specification consistently uses the term "signal strength" to characterize the invention. Dkt. No. 75 at 6 (citing *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370-71 (Fed. Cir. 2016)) (Defs' Responsive Brief). Unlike *GPNE Corp.*, the '286 patent does not indicate the patentee had the explicit desire to redefine the term or disavow its full scope. *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016) (the clear desire from the patentee occurred because the disputed term appeared in the specification over 200 times). Additionally, unlike *GPNE Corp.*, neither Neodron nor defendants have presented any evidence of the prosecution history indicating the patentee's explicit desire to redefine the term or disavow the term's full scope.

Second, the specification's embodiments should not necessarily limit the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). Courts repeatedly warn against confining the claims to the specification's embodiments because "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). In this case, the specification indicates a preferred embodiment, but this preference should not limit the claim language. *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (quoting *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994)).

Third, defendants argue the '286 patent's context justifies the claim limitation. Dkt. No. 75 at 7 (citing *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1097 (Fed. Cir. 2020)) (Defs' Responsive Brief). The Court disagrees. In *McRO, Inc.*, no dispute existed with the mathematical definition of a vector. A vector is "represented by a three-term sequence ($a_x$, $a_y$, $a_z$), each term for one of the three spatial dimensions." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1097 (Fed. Cir. 2020). Here, the sensor value can represent "unclaimed processing

United States District Court
Northern District of California

5

1    steps . . . including any processing, amplification, thresholding, smoothing, noise reduction, whether

2    it is that's done in the process of comparing the values to determine which key is pressed." Dkt. No.

3    73 at 29 (internal quotations omitted) (quoting Dkt. No. 74-13 at 6, *Exhibit 13* (ALJ Markman

4    hearing)) (Pltf's Opening Brief).  Limiting the term would not afford the patentee its full scope.

5

6    **II.    '502 Patent – (A) "sensing area" and (B) "wherein row sensing electrodes of sensing**
     **cells at opposing ends of at least one of the rows are electrically coupled to one another by**
7    **respective row wrap-around connections made outside of the sensing area"**

8                    The '502 patent, entitled "Two-Dimensional Position Sensor," discloses a capacitive

9    position sensor for determining the position of an object within a two-dimensional sensing area.

10   Dkt. No. 72-13, *Exhibit L* ('502 patent); Dkt. No. 73 at 7 (Pltf's Opening Brief).  This capacitive

11   position sensor can be used in objects such as a touchpad or a touchscreen.  Dkt. No. 72-13, *Exhibit*

12   *L* ('502 patent); Dkt. No. 73 at 7 (Pltf's Opening Brief). Claim 1 reads:

13         1. A position sensor comprising:

14         a substrate having a surface with an arrangement of electrodes mounted thereon,

15         wherein the electrodes define an array of sensing cells arranged in columns and rows
           to form a capacitive **sensing area** of the sensor, each sensing cell including a column
16         sensing electrode and a row sensing electrode, the column sensing electrodes of
           sensing cells in the same column being electrically coupled together and the row
17         sensing electrodes of sensing cells in the same row being electrically coupled
           together, and
18
           **wherein row sensing electrodes of sensing cells at opposing ends of at least one**
19         **of the rows are electrically coupled to one another by respective row wrap-**
           **around connections made outside of the sensing area.**
20
21   Dkt. No. 72-13, *Exhibit L* at 12:11-27 (emphasis added) ('502 patent).

22         A.     "sensing area"

23

24   | Plaintiff Neodron | Defendants |
     |---|---|
25   | Plain and ordinary meaning of "an area defined by the sensing cells" | Plain and ordinary meaning of "an area defined by the sensing electrodes" |
26   | | |
27   | Dkt. No. 96 at 4 (Joint Claim Construction). | Dkt. No. 96 at 4 (Joint Claim Construction). |

28                *The Court construes "sensing area" as "an area defined by the sensing cells.".*

6

Construing the term "sensing area" as "an area defined by the sensing electrodes" renders the use of sensing *cells* superfluous and this interpretation is disfavored.  *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 429 (Fed. Cir. 2016) (citing *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004)).  Specifically, the contextual claim language indicates the sensing *area* depends on the sensing *cells*.  Dkt. No. 72-13, *Exhibit L* at 2:45-55.  The sensing cells are formed by row and column electrodes.  *Id.*  In order for sensing cells to be meaningfully different from the sensing area they cannot be identically defined.

**B.**   **"wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective row wrap-around connections made outside of the sensing area"**

| Plaintiff Neodron | Defendants |
|---|---|
| Plain and ordinary meaning of: | Plain and ordinary meaning of: |
| "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by connections that wrap around the respective row and are made outside the sensing area" | "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by connections that wrap around other electrodes in the row and are made outside the sensing area" |
| Dkt. No. 96 at 4 (Joint Claim Construction). | Dkt. No. 96 at 4 (Joint Claim Construction). |

*The Court construes the term in accordance with the plain and ordinary meaning of "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by connections that wrap around the respective row and are made outside the sensing area."*  This construction naturally aligns with the patent's description.

"The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 429–30 (Fed. Cir. 2016).  In this case, the term's use of the word "wrap-around" informs a POSITA that the connection must run from one

7

vertical side of the sensing area to another vertical side of the sensing area.  The language indicates the "wrap-around" connection cannot run from the vertical side of the sensing area to a horizontal side of the sensing area because the connection would not curve around the respective row.  The "wrap-around" connection would not circumscribe most of the respective row's sides.  For example, a connection running between the sensing area's vertical side to the horizontal side would only curve around a part of the respective row and would not "wrap-*around*" the respective row.

## III.    '770 Patent - "generally straight line"

The '770 patent entitled, "Touch Sensor with High-Density Macro-Feature Design," discloses designs for a touch sensor which may detect the presence and location of a touch or the proximity of an object (such as a user's finger or a stylus) within a touch-sensitive area of the touch sensor overlaid on a display screen.  Dkt. No. 72-12, *Exhibit K* ('770 patent); Dkt. No. 73 at 11 (Pltf's Opening Brief).  The term "generally straight line" appears in independent claim 1 and 7 of the '770 patent.  Claim 7, which is representative of the other claims, reads:

7. A touch position-sensing panel comprising:

a sensing area comprising:

a substrate; . . .

the second layer having a second plurality of gaps formed in the mesh, at least one of the plurality of second electrodes separated from an adjacent electrode of the plurality of second electrodes by a gap of the second plurality of gaps, the gap of the second plurality of gaps separating the at least one electrode of the plurality of second electrodes and the adjacent electrode of the plurality of second electrodes from one side of the sensing area to an opposing side of the sensing area;

wherein the plurality of first electrodes and the plurality of second electrodes overlap to create a plurality of nodes;

wherein each of the first plurality of gaps and each of the second plurality of gaps runs in a **generally straight line** from one side of the sensing area to an opposing side of the sensing area and has a width greater than or equal to 5 micrometers and less than 20 micrometers, . . . .

Dkt. No. 72-12, *Exhibit K* at 14:10-67 (emphasis added) ('770 patent).

| Plaintiff Neodron | Defendants |
|---|---|
| Plain and ordinary meaning; No construction necessary Dkt. No. 96 at 4 (Joint Claim Construction). | Indefinite Dkt. No. 96 at 4 (Joint Claim Construction). |

The parties dispute whether the term "generally straight line" is indefinite for failing to comply with 35 U.S.C. § 112.  Dkt. No. 96 (Joint Claim Construction).  ***The Court finds the term is not indefinite.***  Defendants have not overcome the patent's statutory validity presumption with clear and convincing evidence.

Patents are statutorily presumed valid and "any facts supporting a holding of invalidity must be proved by clear and convincing evidence." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001).  Here, defendants have not overcome the patent's statutory validity presumption. Defendants state "generally straight line" renders the patent indefinite "because there is no common understanding among those of ordinary skill in the art about what a 'generally straight line' is relative to the distinguished art, and the patent does not define one."   Dkt. No. 72 at 19 (Defs' Opening Brief).  Defendants argue "generally straight line" is a term of degree, and claims reciting terms of degree are indefinite if they fail to provide objective boundaries for POSITAs when read in light of the specification.  Dkt. No. 72 at 19-20 (citing *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395-96 (Fed. Cir. 2016)) (Defs' Opening Brief).  Specifically, defendants state the specification does not provide "any objective indication for determining whether any specific shape, threshold, or other characteristics is required for an electrode gap to run in a 'generally straight line.'"  Dkt. No. 72 at 21-22 (Defs' Opening Brief).  Furthermore, defendants claim "[a] POSITA would understand that even small variations matter when the gaps are only micrometers across. [citation]. At this size, small differences have large impacts on the nature of the electrodes, which impacts performance. [citation]."  Dkt. No. 72 at 21-22 (citing Dkt. No. 72-3, *Exhibit B* at ¶¶ 36-37 (Silzars Dec.)) (Defs' Opening Brief).

But, courts "have rejected the proposition that claims involving terms of degree are inherently indefinite."  *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir.

2017) (citing *Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1370 (Fed. Cir. 2014)).* "[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (citing *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005)). As Neodron states, the term "generally straight line" does not need to be mathematically precise as it "encompasses some imprecision from a perfectly or exactly straight line, which is appropriate and acceptable to a POSITA." Dkt. No. 73 at 27 (citing Dkt. No. 74-1, *Exhibit 1* ¶¶ 74-75 (Richard A. Flasck Dec.)) (Pltf's Opening Brief).

Defendants rely on *Intel Corp. v. Tela Innovations, Inc.* when making their term of degrees argument. Dkt. No. 72 at 20 (citing No. 3:18-CV-02848-WHO, 2019 WL 5697922 (N.D. Cal. Nov. 4, 2019)) (Defs' Opening Brief). Defendants argue *Intel* is instructive because "*Intel* observed that, although the intrinsic evidence reveals *where* line end spacing is located and *why* minimum size is desirable, it provided no objective way to determine *what* minimum size means." Dkt. No. 72 at 20 (emphasis in original) (citing *Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-CV-02848-WHO, 2019 WL 5697922, at *12 (N.D. Cal. Nov. 4, 2019)). Neodron distinguishes *Intel,* arguing that the *Intel* dispute related to extreme precision and required a microscopic integrated circuit to be "physically and electrically separated by a line end spacing of *minimum* size." Dkt. No. 76 at 19 (emphasis in original) (citing *Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-CV-02848-WHO, 2019 WL 5697922, at *11 (N.D. Cal. Nov. 4, 2019)) (Pltf's Responsive Brief). Here, the '770 patent relates to gaps ranging from 5 to 20 micrometers while *Intel* concerned nanoscale technology. Dkt. No. 72-12, *Exhibit K* at 14:20-25 ('770 patent claim 1); No. 3:18-CV-02848-WHO, 2019 WL 2476620, at *12 (N.D. Cal. June 13, 2019). The difference between micrometers and nanometers is key, as Neodron's expert states: "[a] POSITA would by no means understand that a mesh pattern formed of 5 to 20 micron gaps would necessarily have those gaps running in mathematically perfect straight lines (or in any other mathematically precise shape)." Dkt. No. 74-1, *Exhibit 1* ¶ 77 (Flasck Dec.)). Moreover, "a POSITA [would not] find any inconsistency between the ['770][3] patent claims'

---

[3] There was likely a typographical error where "502" was used, but the '502 patent does not mention these types of gaps.

requirement of small 5 to 20 micron gaps . . . and the requirement that those gaps run only in a generally straight line . . . ." Dkt. No. 74-1, *Exhibit 1* ¶ 77 (Flasck Dec.)).

Further, the *Anchor Wall*[4] court found the word "generally" acts as a descriptive term "commonly used in patent claims to avoid a strict numerical boundary." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310–11 (Fed. Cir. 2003) (internal quotations omitted) (citing *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001)). Also, the patent's specification expressly explains approaches using language like "generally quadrilateral," "generally rectangular," and "generally parallel." Dkt. No. 72-12, *Exhibit K* at 6:50-55, 9:5-10 ('770 patent). As Neodron's expert indicates, the '770 patent's figure 4, which discloses electrodes that are "generally quadrilateral," would inform a POSITA what constitutes a design where gaps run in a "generally straight line." Dkt. No. 74-1, *Exhibit 1* ¶ 75 (Flasck Dec.)). Thus, the specification's use of "generally quadrilateral," "generally rectangular," and "generally parallel" would inform, with reasonable certainty, those skilled in the art about the scope of the term.

Defendants state they "offer ample evidence and the '770 Patent provides no relevant context." Dkt. No. 75 at 14 (citing Dkt. No. 72-3, *Exhibit B* ¶¶ 35-40 (Silzars Dec.)) (Defs' Responsive Brief). However, the defendants' evidence does not meet the clear and convincing threshold to overcome the statutory presumption of validity and the requirement that a patentee need not define their invention with mathematical certainty. Ultimately, the specification use of "generally quadrilateral," "generally rectangular," and "generally parallel" and the macroscopic view would inform, with reasonable certainty, those skilled in the art about the scope of the term. Thus, the term "generally straight line" will maintain its plain and ordinary meaning.

---

[4] Defendants attempt to distinguish *Anchor Wall* arguing it does not address indefiniteness. Dkt. No. 75 at 13 (Defendants' Responsive Brief). However, courts addressing indefiniteness cite *Anchor Wall* for claim constructions disputing the term "generally." *See generally Advanced Aerospace Techs., Inc. v. United States*, 124 Fed. Cl. 282, 306 (2015) (finding the terms "generally vertical" and "generally perpendicular" not indefinite); *Edgewell Pers. Care Brands, LLC v. Albaad Massuot Yitzhak, Ltd.*, No. CV 15-1188-RGA, 2017 WL 1900736, at *2 (D. Del. May 9, 2017) (Finding the term "generally tailor" not indefinite).

United States District Court
Northern District of California

## ISSUE TWO: DEFENDANTS' MOTION TO STRIKE

## BACKGROUND

On April 17, 2020, pursuant to the agreed upon schedule, the parties exchanged their expert witnesses' declarations.  Dkt. Nos. 82-3, *Exhibit 1* (Neodron's Email Service), 82-4, *Exhibit 2* (Defendants' Email Service).   On May 15, 2020, Neodron timely served its first supplemental declaration on defendants.  Dkt. No. 82-5, *Exhibit 3* (Neodron's First Supplemental Declaration Email Service).  Later, Neodron filed its responsive claim construction brief as well as the second supplemental declaration.  Dkt. No. 76 (Pltf's Responsive Brief); Dkt. No. 77-2, *Exhibit 21* (Second Supplemental Declaration) (Filed: June 5, 2020). Defendants state Neodron "did not provide notice . . . that it would submit the Second Supplemental Flasck Declaration, nor did it seek leave of this Court to file it." Dkt. No. 82 at 7 (Motion to Strike).

On June 16, 2020, defendants moved the Court to strike plaintiff the second supplemental Flasck declaration and portions of Neodron's responsive brief citing thereto.  Dkt. No. 82 (Motion to Strike) (Dkt. No. 76 (Pltf's Responsive Brief); Dkt. No. 77-2, *Exhibit 21* (Richard A. Flasck Supplemental Dec.)).   Specifically, defendants state the second supplemental declaration was "untimely and highly prejudicial."  Dkt. No. 82 at 5 (Motion to Strike).

Neodron argues the second supplemental Flasck declaration is proper because, by arguing the "generally straight line" term is indefinite, defendants have converted a claim construction issue into a summary judgment motion: "the declaration [defendants] seek to strike is exclusively responsive to [defendants'] motion for summary judgment."  *Id.* at 2.  Plaintiff argues the supplemental declaration is proper because "it does not concern all the garden-variety claim construction disputes before this Court" rather "it solely concerned [d]efendants' summary judgment arguments for invalidity based on indefiniteness [for the 'generally straight line' term]." *Id.* Neodron argues the inclusion of the second supplemental declaration is harmless and permitted under FRCP 37.  *Id.* at 4 (Disclosures allowed if they are "substantially justified or harmless").  Additionally, Neodron argues striking lines from their brief is improper because "[the brief lines] do not solely rely on Flasck's Second declaration and, in some cases, plainly do not rely on that declaration at all."  *Id.* at 7-8.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**LEGAL STANDARD**

The Northern District of California's "Local Rules exist to further the goal of full, timely discovery and provide all parties with adequate notice and information with which to litigate their cases, not to create supposed loopholes through which parties may practice litigation by ambush." *IXYS Corp. v. Advanced Power Tech., Inc.*, No. C 02-03942 MHP, 2004 WL 1368860, at *3 (N.D. Cal. June 16, 2004). "The rules are designed to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." *O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1366 & n.12 (Fed. Cir. 2006) ("The rules . . . seek to balance the right to develop new information in discovery with the need for certainty as to the legal theories.").

**DISCUSSION**

The Court GRANTS defendants' motion to strike plaintiff's second supplemental declaration. The second supplemental declaration was untimely based on the amended case schedule and local patent rules. Local patent 3-3(a) indicates "Invalidity Contentions" contain any grounds for indefiniteness under 35 U.S.C. § 112(2). Parties must exchange proposed terms for construction no later than "14 days after service of the 'Invalidity Contentions' pursuant to Patent L.R. 3-3." Patent L.R. 4-1(a). "The parties shall simultaneously exchange *proposed constructions of each term* identified by either party for claim construction" no "later than 21 days after the exchange of the lists pursuant to Patent L.R. 4-1." Patent L.R. 4-2 (emphasis added). "At the same time the parties exchange their respective '*Preliminary Claim Constructions*,' each party shall also . . . designate any supporting extrinsic evidence including, without limitation, . . . testimony of percipient and expert witnesses." Patent L.R. 4-2(b) (emphasis added). Ultimately, Neodron failed to abide by the local patent rules because Neodron did not timely disclose the supplemental testimony. Therefore, the Court STRIKES the Supplemental Flasck Declaration and any reference thereto or reliance thereon in plaintiff's responsive brief.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby adopts the constructions set forth in this order.

The Court GRANTS defendants' motion to strike plaintiff's second supplemental declaration.

The Court GRANTS plaintiff's motion to strike their own claim construction reply brief.[5]

**IT IS SO ORDERED**.

Dated: July 13, 2020

_____
SUSAN ILLSTON
United States District Judge

---

[5] On June 12, 2020, plaintiff filed a claim construction reply brief. Dkt. No. 79.  Defendants did not file a claim construction reply brief.  Dkt. No. 81 at 2 (motion to strike). Subsequently, plaintiff "discovered that Defendants had interpreted the Court's Scheduling Order as prohibiting the filing of reply claim construction briefs."  Dkt. No. 81 at 2.  On June 13, 2020, plaintiff voluntarily withdrew their claim construction reply brief and moved the Court to strike the reply brief.  Dkt. No. 81 at 2. The Court GRANTS the plaintiff's motion to strike their own claim construction reply brief.